KARL W. LANO v. ROCHESTER GERMICIDE COMPANY.

113 N. W. (2d) 460.

January 26, 1962—Nos. 38,269, 38,342.

*Culhane & Culhane,* for appellant.

*Cant, Haverstock, Beardsley, Gray & Plant* and *James S. Simonson,* for respondent.

OTIS, JUSTICE.

These appeals, which have been consolidated for hearing, are from an order denying plaintiff's motion for substituted findings or for a new trial and from a judgment in favor of defendant.

This action was brought to recover a sum which plaintiff asserts is presently payable under a profit-sharing pension plan instituted when he was employed by defendant. The only question for review is whether the defendant has a right to defer payments until plaintiff reaches the age of 65 in the year 1976.

The defendant is engaged in the business of producing and distributing sanitary supplies. It appears without dispute that plaintiff was employed by defendant from May 1941 until January 3, 1959. On December 27, 1956, the company announced that a profit-sharing plan was available to all employees who elected to come under it. On January 18, 1957, in a letter to its employees defendant stated that the plan was intended to supplement their social security at the time of their retirement. The letter was accompanied by a pamphlet which outlined the purpose, functions, and manner of administration of the pension fund, and stated that it would be created out of company profits determined before the payment of taxes and year-end bonuses, effective December 31, 1956. The pamphlet further announced that none of the cost would be charged to the employees, that they could not withdraw their money immediately, that it would be held in trust until their normal retirement age, and with some exceptions any employee who quit his job or was discharged would have a vested interest in the fund after a given number of years of service. The employees were invited to inspect the entire document which created the trust. That instrument was a bilateral agreement between the company and the Lincoln Rochester Trust Company, designated trustee to administer the funds. The preamble of the contract stated that the purpose of the plan was to permit employees to participate in profits and "particularly, to provide its employees with retirement

benefits at their normal retirement ages." It further provided that the fund was to be created out of 15 percent of the annual operating profits before taxes, wage dividends, and bonuses. Each employee who applied and participated was conclusively deemed to have consented to its terms. Vested interests were defined, and the normal retirement age for men was fixed at 65 years. Under the agreement the company was to appoint an advisory committee with power to determine conclusively all questions and disputes involving the interpretation or construction of the agreement. Finally, the trust instrument provided that the agreement did not confer on any employee a right to be retained in service. It was not to be construed as a contract of employment.

On December 29, 1958, the defendant's president wrote to plaintiff discharging him as manager of the St. Paul office but offering him employment in a different capacity either in St. Paul or elsewhere, and advising plaintiff that his salary and other benefits would continue for 4 months if he left the company for a position which was not in competition with it. Early in March 1959 plaintiff informed the defendant of his intention to establish a competitive business and asked leave to sell defendant's products, which defendant refused. Upon being advised of plaintiff's plans, the company terminated his salary and other wage benefits and informed him of the advisory committee's plan to defer his pension payments.

There is no dispute but that plaintiff at the time he terminated his employment had a vested interest in the fund amounting to $2,562.88. However, the advisory committee elected to transfer that amount to an interest-bearing account to be held for the plaintiff until he reached the age of 65, his age then being 47. The committee determined that by the time plaintiff reached the normal retirement age the fund would have appreciated to roughly $4,400, permitting him to receive monthly payments of $100 for about 4 years in addition to his social security.

In essence, it is plaintiff's position that defendant, acting through the advisory committee which it appointed, was arbitrary and discriminatory in refusing to make immediate payment of his vested interest, and that its motive in deferring payment was to deny plaintiff the capital which he needed to enter a competitive business.

■ Plaintiff seeks to set aside the court's finding that contributions

to the retirement fund came entirely from the company. The only testimony which plaintiff introduced to support the claim that he himself contributed to the fund was his own statement at the trial that the president of the company wrote him to determine whether he would be willing to contribute a percentage of his income to the plan, to which plaintiff said he demurred, stating he wished to pursue his own investment program. However, plaintiff testified that the president of the company assured him of substantial increments in his investment and for that reason he consented to "go along." None of this correspondence was produced at the trial. There was no evidence introduced to show he made any contribution to the fund. Plaintiff claims, however, that the fact he received year-end wage dividends prior to the adoption of the plan, and failed to receive them thereafter, requires a finding that he contributed. The fallacy in plaintiff's argument is that he had no employment contract requiring the company to make such payments. The trial court would not have been justified in making a finding that these circumstances alone constituted a contribution by plaintiff. The pamphlet distributed to the employees, the trust agreement itself, the testimony of defendant's vice president-treasurer, and all the other evidence conclusively refute this contention.

Nor is there any merit in plaintiff's claim that he was induced to remain in defendant's employment by the company's offer to include him in the profit-sharing plan. Nowhere does the record show that plaintiff's application for participation in the plan influenced his decision to continue with the company. The explanatory pamphlet itself expressly admonished against such reliance.

■ Over plaintiff's strenuous objection, defendant's vice president was permitted to testify to the details of the advisory committee's deliberations, notwithstanding the fact that the official minutes of their meeting failed to include any exposition of the reasoning which prompted their ultimate decision. The vice president testified that the committee did consider plaintiff's needs, and concluded that it was in plaintiff's best interest to defer payment until his retirement. The committee was of the view that since Mr. Lano was only 47 years of age he would have no difficulty in reestablishing himself in business,

and that he would realize more substantial benefits if he received the money in monthly payments at retirement age.

Plaintiff takes the position that the testimony of what transpired at the advisory committee's meeting is in violation of the best-evidence and parol-evidence rules and permits a party to impeach his own witness. The minutes of the meeting of the advisory committee held April 15, 1959, merely disclose the committee's decision to have plaintiff's vested interest transferred to an interest-bearing account for distribution upon his reaching the age 65 in the manner referred to. Defendant's vice president testified that the minutes were a full and complete report of the events which occurred at the meeting. Counsel for plaintiff asked if exhibit E (the minutes) "[c]ontains all of the minutes contained at that meeting and discussion," to which the vice president answered, "That is true." On the strength of this response, the plaintiff contends that it was error thereafter to permit defendant's vice president to elaborate on the business transacted at that meeting and, more particularly, to permit him to testify with respect to the factors which were discussed and considered in disposing of plaintiff's interest in the trust fund.

A witness may not testify to the contents of a written document which is available but has not been introduced, since the document itself is the best evidence. Here, however, the minutes were received at the trial. Hence the best-evidence rule has no application. By the same token, if the minutes had constituted a contract with plaintiff, the parol-evidence rule would bar oral testimony concerning terms and conditions which were at variance with the provisions of the agreement recited in the minutes. Whether or not a contract was created by the minutes, the testimony of defendant's vice president regarding the committee's deliberations was not inconsistent with their ultimate decision, and the parol-evidence rule is therefore not involved.

We have held that minutes of corporate meetings are only a prima facie record of the proceedings, and that oral testimony is admissible to show that the minutes are incomplete. State ex rel. Copper Butte Mines v. Guertin, 106 Minn. 248, 119 N. W. 43; Northland Produce Co. v. Stephens, 116 Minn. 23, 133 N. W. 93; Northwest Nat. M. C. & V. Co. v. McConnell, 153 Minn. 398, 190 N. W. 608; Constructors'

Assn. of Western Pa. v. Furman, 170 Pa. Super. 554, 87 A. (2d) 801; Home Savings Bank v. Gertenbach, 270 Wis. 386, 71 N. W. (2d) 347; Petrishen v. Westmoreland Finance Corp. 394 Pa. 552, 147 A. (2d) 392; Malone v. Melnick, 378 Pa. 483, 106 A. (2d) 806, 48 A. L. R. (2d) 1254, and Annotation at 1259.

The rule is summarized in 5 Fletcher, Cyclopedia Corporations (Perm. ed.) § 2198, p. 698, as follows:

"Where the minutes contain a record of action taken, it will be presumed, prima facie, that the record covers the entire action. This is not conclusive, however, and parol evidence may be introduced to show what was in fact done, and if the minutes appear on their face or are shown to be incomplete or incorrect or otherwise fail to show what actually transpired, parol evidence is admissible to supply the omission and to aid, correct and supplement them, or to aid in ascertaining the true meaning of indefinite or ambiguous records."

It is obvious on the face of the minutes that they do not purport to contain a verbatim recitation of the conversations prefacing the final decision which disposed of Mr. Lano's interest.

We therefore conclude that it was proper to receive evidence of the discussions which prompted the committee's action.

■ The principal issue for decision is whether the evidence supports the trial court's conclusion that the advisory committee acted in good faith, or whether the record compels a finding that the committee's decision was arbitrary and discriminatory.

The trust instrument provides that where, as here, the employee's interest has vested, the advisory committee has the power in its sole discretion to determine what distribution is in his best interests. The agreement requires the advisory committee to consider the amount of the participant's interest, his needs, and the economic conditions which then prevail. In addition, the trust instrument states that the committee may consult with the employee but is not bound to do so, and in any case its decision is not to be governed by the expressed wishes of the participant. The evidence discloses that only in cases where the employee's vested interest amounted to less than $2,000 was a cash payment made, since the company deemed such amounts too insignif-

icant for purposes of working out an annuity or some other retirement plan. Plaintiff presented no evidence that any employee in his position had been treated differently or had received any cash payment at his age.

In support of his contention that the company's decision was not reached in good faith and was designed to penalize him for competing, plaintiff testified that he was not consulted or invited to state his own views with respect to distribution. In answer to this complaint, the company's vice president replied that neither a request for a hearing, nor any other communication was directed to the company calling attention to a need for immediate payment. In addition, the defendant points out that in announcing its decision the company advised Mr. Lano that the plan would be reviewed in the future if there was a change in his situation, and under such circumstances he was encouraged to confer with the committee.

Plaintiff asserts that the discretionary powers vested in the committee together with a provision granting it immunity from liability (except for willful misconduct) are unconstitutional and contrary to public policy. However, plaintiff cites no authority in support of this position. Having in mind our conclusion that plaintiff made no contribution to the retirement fund, and that the creation of the fund was not an inducement to his continuing his employment, and the further fact that plaintiff was performing services in a relationship which could be terminated at will, we sustain the court's finding that the decision of the advisory committee was reached in good faith and was not arbitrary or the product of discrimination. To be sure, one of the purposes of the profit-sharing plan was frustrated by plaintiff's terminating his employment. Subsequent to that time the plan no longer acted as an inducement to encourage plaintiff to perform his duties in the company with fidelity and industry. However, plaintiff loses sight of the basic purpose of the plan which is specifically described in the trust agreement thus:

"* * * to provide its employees with retirement benefits at their normal retirement ages, * * *."

Nowhere in either the announcement or the trust instrument is it

suggested that the retirement benefits shall be paid on a deferred basis only if the employee continues to work with the company until retirement age. The pamphlet accompanying the announcement expressly states that upon quitting or discharge, vested interests will be paid under such plan as the advisory committee decides. The evidence is clear that cash payments are made only where the vested interests are so small that the expense and trouble of administering it do not warrant a long-range program. In the light of the announced purpose of the plan, the failure of the plaintiff to make his needs known to the committee, the substantial benefits that would accrue to plaintiff under the proposed disposition, and the absence of evidence that it was actually detrimental to plaintiff's interests, and having in mind his right to request a reconsideration as his circumstances change, we cannot say that the committee's decision was arbitrary or that the trial court's findings were unsupported by the evidence.

All the cases which have been called to our attention take the position that great latitude is tolerated in the exercise of judgment by pension-fund trustees. It is not our function to determine whether the committee's disposition is one we would have selected. It has been held that the failure to accord a hearing is not in itself evidence of bad faith. Clark v. New England T. & T. Co. 229 Mass. 1, 118 N. E. 348; Cimprich v. Pennsylvania R. Co. 119 Pa. Super. 5, 180 A. 51. Where the pension plan provides that the committee's decision is conclusive, it has been said that fraud or bad faith must be proved by "overwhelming" evidence. Menke v. Thompson (8 Cir.) 140 F. (2d) 786. In reviewing the decisions of other jurisdictions, the Oklahoma court stated in Going v. Southern Mill Employees' Trust (Okla.) 281 P. (2d) 762, 763:

"* * * we conclude that an employer who creates a profit sharing retirement plan for the benefit of his employees, which plan is a voluntary one supported solely by contributions from the employer, has the right to prescribe the terms of the plan and the manner in which it shall be administered; and such terms as are prescribed are binding upon and determinative of the rights of an employee asserting a right to benefits thereunder. And where the terms of the plan as prescribed by such

employer provide that the decision of the trustees appointed to administer such plan shall be final and conclusive, the decision of such trustees is binding on an employee claiming benefits under such plan."

The New Hampshire court has held that an employee who is aware of the terms and conditions of a profit-sharing plan signifies an acceptance of its terms by his continued employment. Molburg v. Hunter Hosiery, Inc. 102 N. H. 422, 158 A. (2d) 288. In sustaining the validity of provisions which confer on the employer broad discretion in determining eligibility for a retirement pension, the fact that the plaintiff did not enter his employment in reliance on the payment of pension benefits was emphasized in Neuffer v. Bakery & Confectionery Workers Inter. Union (D. D. C.) 193 F. Supp. 699. All of the cases dealing with the subject hold that where a pension plan is not a part of a contract of employment, and the employee makes no contributions to it, the company may retain broad discretion in administering the fund since the benefits are in the nature of gratuities. The disposition of such funds is limited only by the terms of the trust instrument. Under these circumstances the courts have refused to interfere unless the aggrieved party has made a strong showing that the company acted arbitrarily, capriciously, fraudulently, or in bad faith. MacCabe v. Consolidated Edison Co. 30 N. Y. S. (2d) 445; Hughes v. Encyclopaedia Britannica, 1 Ill. App. (2d) 514, 117 N. E. (2d) 880, 42 A. L. R. (2d) 456, and Annotation at 473; Umshler v. Umshler, 332 Ill. App. 494, 76 N. E. (2d) 231; Norman v. Southern Bell T. & T. Co. (Ky.) 322 S. W. (2d) 95; 70 Harv. L. Rev. 490.

We therefore hold that the reservation of broad discretion by defendant's advisory committee is not unconstitutional or contrary to public policy, and that the evidence supports the trial court's findings that in exercising its discretion the advisory committee was not discriminatory and did not act arbitrarily or in bad faith.

Affirmed.

DELL, CHIEF JUSTICE (dissenting).

Plaintiff started to work for the defendant in 1941. At the end of each year he received a year-end wage dividend. This continued until defendant's "Deferred Profit-Sharing Plan" was established.

Shortly before this plan was adopted defendant's president wrote to plaintiff, according to his uncontradicted testimony, inquiring whether plaintiff was willing to contribute a percentage of his income to the plan. He answered stating that he preferred to make his own investments. In 1957 the profit-sharing plan was put into effect, year-end wage dividends were no longer paid, and plaintiff continued his employment.

On December 29, 1958, defendant's president wrote a letter to plaintiff stating:

"During these several years in which you have managed our St. Paul office your effectiveness has been excellent in directing the operating details of office, stockroom and service. In the field of sales leadership and direction there is much to be desired. You and we both anticipated this shortcoming when you took the position. We hoped that you might master this lack; but we must admit that you have not done so.

"So, we are asking that you turn over the position to one of our other men who has done especially well in sales direction, * * *.

"You have given your Company your best efforts in the past years. For this reason we want to help you all possible in the next few months while you seek to readjust yourself to whatever work you may choose. Of course we can recommend your honesty, your willingness to work, your abilities in all but sales direction, in the highest terms to any other prospective employer.

"Not only will you receive your full compensation of all kinds due you under your regular manager plan for 1958; *but you will receive more if you do not enter into competition with us* or do anything detrimental to our Company's interest." (Italics supplied.)

The letter then went on to say that he could work for the defendant in some other capacity in St. Paul or elsewhere and that the company had decided to continue his salary for a period of 4 months if he accepted a position elsewhere which was not in competition with the defendant.

It is apparent from this letter that plaintiff had been a good employee in all respects other than in "sales leadership." It is also apparent that

the defendant was anxious that plaintiff obtain employment elsewhere than in a competitive business and it seems quite clear to me that the statement in the president's letter *"but you will receive more if you do not enter into competition with us"* had reference to defendant's vested interest of $2,562.88 in the "Deferred Profit-Sharing Plan" since there was nothing else which plaintiff had coming.

Finally plaintiff informed defendant that he had decided to go into business for himself in a line similar to defendant's and inquired whether it would be possible for him to sell defendant's products. This was a reasonable request since plaintiff had worked for the defendant for nearly 18 years and was thoroughly familiar with its products. This, defendant refused, promptly discharged him, and cut off his salary stating: "We then discontinued the salary also as soon as you notified us that you thought it best to go into business for yourself in line similar to ours." In the same letter his attention was called to the letter of its advisory committee informing him that he "had a fully vested interest of $2,562.88" in the Deferred Profit-Sharing Plan and that these funds were to be distributed to him at the rate of $100 a month commencing October 1, 1976.

Plaintiff had written defendant's president at Rochester, New York, stating that he would appreciate it if the money owing him under the profit-sharing plan was paid without further delay. He further said: "Surely you must agree that I acted in good faith * * *. I feel that I deserve somewhat better treatment than that accorded a discharged inefficient employ, rather than one who has served your Company loyally and faithfully for the past eighteen years."

Since nothing was done, plaintiff instituted this action to recover $2,562.88. He was then 47 years old, needed the money in the profit-sharing plan, and claimed that the action of the defendant and its advisory committee, in withholding payment, was arbitrary, capricious, and in bad faith. He also claimed that they refused to turn the money over to him, not because they wanted to invest it for him, but because they wanted to keep it from him so as to prevent him from engaging in a competitive business with the defendant. On the other hand, defendant and its advisory committee took the position that it was in the best interests of the plaintiff to defer payment until plain-

tiff had reached 65, the age of retirement. They took this position notwithstanding that they were compelled to concede that in cases where employees severed their employment with defendant with an interest in the profit-sharing plan of less than $2,000, these sums were paid since amounts of that size were too insignificant for use in working out an annuity or some other retirement plan. But in the instant case, although plaintiff's interest in the profit-sharing fund was only slightly in excess of that figure, and although a strained feeling between them existed, defendant took the untenable position that deferring payment to the plaintiff for 18 years was in his best interests. It appears clear to me that the action of the defendant and its advisory committee in withholding, until plaintiff reaches age 65, the amount of $2,562.88 due him under the Deferred Profit-Sharing Plan is arbitrary and capricious, if not fraudulent, and that it was engendered in bad rather than in good faith.

At the very outset, it seems to me that, when directing plaintiff to turn over his position to another of its employees, defendant cunningly offered him 4 months' salary for no other reason than to induce him to procure employment elsewhere not competitive with it. But just as soon as he informed it that he intended to engage in a similar line of business, defendant's plan and scheme, and that of its advisory committee, came into full view, and he was promptly discharged. His vested interest in the profit-sharing plan was set aside and ordered withheld for 18 years until he reaches the age of 65. It is then payable to him only at the rate of $100 a month. At the same time and as what appears to me to be a part of the same scheme and plan, the advisory committee informed him that if there was a change in circumstances that would justify the committee in reconsidering action, the plaintiff should not hesitate to write it. This is not the case of a defendant acting in good faith in the interest of one of its regular employees who is no longer employed or has retired. It is the case of a defendant who discharged an employee after years of service, fearful of his entering into a competitive business—the activities of a defendant who, lacking good faith, is endeavoring to withhold from that employee the money necessary to enable him to engage in a competitive enterprise. It is the case of a defendant who, for no other reason than lack of "sales leader-

ship," has discharged an employee, and with its eye on the dollar, is endeavoring to stop him from engaging in competitive lines in order to earn his livelihood. Since, in my opinion, its actions and conduct are clearly arbitrary and capricious, if not fraudulent, the lower court should be reversed. I, therefore, dissent.